## Mertz v. Temple University Hospital

*Paul A. Lauricella* and *Barbara R. Axelrod,* for plaintiffs.

*Mary Ellen Reilly,* for defendants.

GOLDMAN, *J.*, June 28, 1995—

I.

This case involves allegations of psychiatric malpractice concerning the failure to involuntarily commit a patient. On June 10, 1988, Phyllis Litostansky went to Temple University Hospital's psychiatric emergency room seeking to have her husband Richard Litostansky

involuntarily committed. Mr. Litostansky had a history of alcohol and substance abuse and had attempted suicide in the past. On June 10, Mr. Litostansky had written several suicide notes, each addressed to a different member of his immediate family. Upon learning about the notes, Mrs. Litostansky became increasingly worried and tried to convince her husband that he needed help. She ultimately sought the assistance of the police who informed her that she would have to go to Temple to get a form in order to involuntarily commit her husband.[1]

Thus, with the help of Temple's mental health worker, Mrs. Litostansky prepared a petition for involuntary commitment. Pursuant to the petition, the police took Mr. Litostansky to Temple's psychiatric emergency room. Upon arrival, he was described as belligerent and hostile and was placed in four-point restraints. Defendant Barry Levine, M.D., a resident and the psychiatrist on staff that night, examined Mr. Litostansky and diagnosed him as suffering from an adjustment disorder and polysubstance abuse. However, Dr. Levine chose to discharge Mr. Litostansky.

On June 27, 1988, 17 days after the examination at Temple, Mr. Litostansky committed suicide by filling his home with natural gas and igniting it. The ensuing blast toppled his row house and demolished the adjacent home where the three minor plaintiffs resided. Two of the minor plaintiffs sustained severe burns in the explosion and fire.

On June 21, 1990, the minor plaintiffs, Harry Mertz, April Mertz and Patrick Odenbreit, through their mother,

---

1. The police were referring to what is known as a "302 petition" based on section 7302 of the Pennsylvania Mental Health Procedures Act. 50 P.S. §7302. The "act establishes rights and procedures for all involuntary treatment of mentally ill persons." 50 P.S. §7103. Further, in order to involuntarily commit a person, a 302 petition must be completed.

Theresa Odenbreit, instituted this medical malpractice action against Temple, Dr. Levine and Gerald Mehalick, D.O.[2] They alleged that defendants were grossly negligent in failing to involuntarily commit Mr. Litostansky, and this gross negligence was a substantial factor in causing the explosion and their injuries. The case proceeded to a jury trial held from January 27 to February 7, 1995. It was bifurcated into a liability phase and a damages phase. After finding in favor of plaintiffs on liability, the jury heard evidence concerning the plaintiffs' damages. The jury returned a verdict in favor of Patrick Odenbreit in the amount of $2.5 million, in favor of Harry Mertz in the amount of $2.5 million and in favor of April Mertz in the amount of $500,000. Defendants filed post-trial motions seeking a new trial, judgment notwithstanding the verdict or remittitur. Plaintiffs filed a petition for delay damages. For the reasons discussed below, defendants' post-trial motions were denied in part and granted in part. Plaintiffs' petition for delay damages was granted with regard to Patrick Odenbreit and Harry Mertz and modified with regard to April Mertz.

## II. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

Defendants first move for judgment notwithstanding the verdict. They argue that they are entitled to judgment n.o.v. for the following reasons: (1) plaintiffs' proof

2. When the case came to trial, the minor plaintiffs were suing through Idee Fox, their guardian ad litem. Theresa Odenbreit and her husband, David Christmas, were also originally named as plaintiffs. However, no damages were sought on behalf of them at trial, and no evidence was presented concerning them. Dr. Mehalick was the attending physician at Temple but was not present on June 10, 1988, the night Mrs. Litostansky attempted to have her husband involuntarily committed. During trial, the action against Dr. Mehalick was voluntarily discontinued.

of negligence was deficient as a matter of law; (2) the court erred in permitting the opinion testimony of plaintiffs' expert Henry Pinsker, M.D.; (3) plaintiffs presented conflicting testimony of gross negligence and (4) the jury's verdict was against the weight of the evidence. Preliminarily, it should be noted that Pennsylvania courts only grant a motion for judgment n.o.v. in limited circumstances. *Robertson v. Atlantic Richfield Petroleum Products Co.,* 371 Pa. Super. 49, 58-59, 537 A.2d 814, 819 (1987), *allocatur denied,* 520 Pa. 590, 551 A.2d 216 (1988). The court reviewing the motion must view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict winner. *Olson v. Dietz,* 347 Pa. Super. 1, 10, 500 A.2d 125, 129 (1985). Further, judgment n.o.v. is only appropriate when no two reasonable persons could fail to agree that the verdict was improper. *Erkens v. Tredennick,* 353 Pa. Super. 236, 240, 509 A.2d 424, 426 (1986), *appeal dismissed,* 516 Pa. 1, 531 A.2d 778 (1987). Based on these standards, defendants' motions for judgment n.o.v. were denied.

## A.

Defendants first contend that plaintiffs' proof of negligence was deficient as a matter of law. In support of this proposition, defendants first argue that there was no evidence showing that defendants owed plaintiffs a duty of care. Although plaintiffs were not patients of Dr. Levine, the law in Pennsylvania establishes that defendants owed a duty to the minor plaintiffs.

It is hornbook law that a defendant cannot be held liable to a plaintiff unless the defendant owed a duty of care to the plaintiff. See *Shaw v. Kirschbaum,* 439 Pa. Super. 24, 33, 653 A.2d 12, 16 (1994) (outlining elements of a cause of action for negligence). It is obvious that a doctor owes a duty of care to his/her patient but when dealing with third persons, the duty issue becomes more complicated. However, the Superior Court of Penn-

sylvania has recognized that a foreseeability analysis is appropriate when determining whether a physician owes a duty to a third person. *Crosby by Crosby v. Sultz,* 405 Pa. Super. 527, 538, 592 A.2d 1337, 1343 (1991). "In essence, the question asked and addressed by the appellate courts was whether it was reasonably foreseeable that third persons would be harmed by the conduct of the physicians." *Id.*

Defendants argue that they cannot be held liable to the minor plaintiffs because Mr. Litostansky did not pose a threat to others when he was brought to Temple's psychiatric emergency room. They claim that since Mr. Litostansky never threatened the plaintiffs or anyone else with harm, plaintiffs were not of a class of persons to whom defendants could have reasonably foreseen injury. However, this argument must fail.

The Pennsylvania Supreme Court has reviewed the potential liability for negligently releasing a psychiatric patient and has considered the existence of a duty to a third party injured by a released patient. In two cases, the court found that the third party plaintiff was included in the doctors' and hospitals' scope of duty. See *Sherk v. County of Dauphin,* 531 Pa. 515, 614 A.2d 226 (1992) and *Goryeb v. Commonwealth, Department of Public Welfare,* 525 Pa. 70, 575 A.2d 545 (1990) (discussing liability of physicians and hospitals which negligently released psychiatric patients).

In *Goryeb,* the patient, Jeffrey Geiger, was brought to defendant hospital on the eve of Thanksgiving pursuant to an involuntary commitment form. *Id.* at 73, 575 A.2d at 546. The police officer who completed the form asserted that Geiger was "a clear and present danger to himself and others." [3] *Id.* The police officer had found Geiger

---

3. Section 7301 of the Mental Health Procedures Act outlines the standard for involuntary commitment. 50 P.S. §7301.The statute provides:

"(a) Persons Subject.—Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject

holding a hunting knife and threatening to harm himself. *Id.* Geiger also told the police officer that he had contemplated shooting himself a week earlier because he was upset about the termination of a long-term relationship with his girlfriend, Marie Collins. *Id.*

Geiger was admitted for five days, as provided by the statute, but due to the holiday weekend, he received little treatment.[4] Although the statute provides a procedure to extend involuntary treatment beyond the five-day period, the hospital and doctors chose not to seek extended treatment. *Id.* Thus, Geiger was released. *Id.*

One week later, Geiger went to Collins' residence which was also occupied by her current boyfriend, Thomas Nice, and another male, Greg Goryeb. *Id.* at 74, 575 A.2d at 546-47. He shot all three residents killing Goryeb and wounding Collins and Nice. *Id.* at 74, 575 A.2d at 547. Nice, Collins and Goryeb's estate sued the hospital, the Commonwealth, the Department of Public Welfare and Dr. Yao C. Wang.[5] *Id.*

The defendants moved for summary judgment based on the defense of sovereign immunity. *Id.* The trial court denied the motion, and the Commonwealth Court permitted an interlocutory appeal. *Id.* The Commonwealth Court reversed and directed the trial court to

---

to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses *a clear and present danger of harm to others or to himself.*" (emphasis added) 50 P.S. §7301(a). *Thus, a patient must satisfy the statutory criteria before being admitted on an involuntary emergency basis.*

4. Section 7302(d) provides that a patient undergoing involuntary treatment must be discharged within 120 hours unless the patient is admitted to voluntary treatment or a certification for extended treatment is filed. 50 P.S. §7302(d).

5. Nice and Goryeb did not file actions against Dr. Wang.

enter summary judgment for the defendants. *Id.* Plaintiffs appealed to the Supreme Court which reversed the Commonwealth Court.

Although the court centered its analysis around sovereign immunity, its discussion regarding the defendants' liability is instructive here. After deciding that the doctrine of sovereign immunity did not insulate the Commonwealth defendants from liability, the court addressed the extent of liability. The court relied on the immunity provision of the Mental Health Procedures Act which provides in relevant part:

"(a) In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences." 50 P.S. §7114(a).

The court noted that under a "converse reading" of the statute, one who is grossly negligent in discharging a mentally disabled patient is liable for that decision or for any of its consequences. *Goryeb, supra* at 78, 575 A.2d at 549.

"Clearly, the words 'any of its consequences' indicate the legislative recognition that discharging a severely mentally disabled person, especially an involuntary admittee who has been classified, by statutory definition, as a clear and present danger to himself or others, is *a potential serious danger not only to the patient himself but to 'others.'* " *Id.* (emphasis added) (footnote omitted)

Two years later, the Supreme Court relied on the same analysis in finding that a hospital could be liable to a

third person for injuries inflicted by a released patient. *Sherk, supra* at 527, 614 A.2d at 232. In *Sherk,* the defendant hospital discharged Mark Jordan from its care. *Id.* at 517, 614 A.2d at 227. Plaintiff Sherk, a police officer, encountered Jordan with possession of a gun. *Id.* Jordan obtained possession of Sherk's gun and shot and wounded Sherk. *Id.* Jordan then committed suicide. *Id.*

Sherk sued the hospital alleging that his injuries were caused by its reckless and negligent discharge of Jordan. *Id.* The hospital filed preliminary objections, in the nature of a demurrer, alleging immunity. *Id.* The trial court denied the demurrer, and the Commonwealth Court reversed. *Id.* The Supreme Court then reversed the Commonwealth Court and found the hospital was not immune from suit.

The court then reaffirmed its decision in *Goryeb* that a patient who has been characterized as a clear and present danger to himself poses a serious threat to others as well. *Id.* at 527, 614 A.2d at 232. The court further found that the injuries sustained by Sherk were a consequence of Jordan's release, and thus the hospital could be found liable. *Id.*

In this case, Mr. Litostansky was a clear and present danger to himself when he was brought into Temple's psychiatric emergency room. Therefore, under the language of *Goryeb* and *Sherk,* he also constituted a potential serious danger to others. The defendants should have recognized this possible danger. Thus, the minor plaintiffs were in a class of persons to whom defendants could have reasonably anticipated injury.

Defendants argue that since Mr. Litostansky did not specifically identify or threaten the minor plaintiffs, they did not owe them a duty of care. Defendants base their contention on two recent cases decided by the Superior Court of Pennsylvania. See *Leonard v. Latrobe Area Hospital,* 425 Pa. Super. 540, 625 A.2d 1228 (1993) (discussing psychiatrist's duty to warn third parties of

patient's violent propensities); *Dunkle v. Food Service East Inc.,* 400 Pa. Super. 58, 582 A.2d 1342 (1990) (deciding whether health professional owes duty to one other than patient). However, although defendants correctly cite the court's holdings in those cases, they do not apply here.

In *Dunkle,* the patient Tindal was diagnosed as having schizophreniform disorder and was taking medication to treat the illness. *Dunkle, supra* at 61, 582 A.2d at 1344. His treating psychiatrist eventually discontinued the medication and discharged Tindal. *Id.* Several months later, Tindal strangled his live-in girlfriend who ultimately died from the attack. *Id.*

Upon a motion for summary judgment, the trial court determined that the defendant doctors and hospitals did not owe a duty to plaintiff's decedent. *Id.* The Superior Court affirmed and held "that a psychologist (or psychiatrist) owes no duty to warn or otherwise protect a non-patient where the patient has not threatened to inflict harm on a particular individual." *Id.* at 68, 582 A.2d at 1347. The court reaffirmed its holding three years later in *Leonard* when it found that a psychiatrist owed no duty to warn his patient's wife of the patient's dangerous propensities. *Leonard, supra* at 547, 625 A.2d at 1232. The court unequivocally held that the specific identity of an intended victim must be brought to the doctor's attention before a duty to warn arises. *Id.*

However, this case involves the Mental Health Procedures Act. In light of the Supreme Court's discussions in *Sherk* and *Goryeb,* which also implicated the statute, it would be error to require specific threats to the minor plaintiffs before imposing a duty on defendants. Also, plaintiffs did not allege that defendants should have warned or protected them. Rather, they contended that defendants were grossly negligent in discharging Mr. Litostansky, and in doing so, defendants breached a duty of care owed to them. Finally, it should be noted

that in *Sherk,* the patient did not even know the third party plaintiff much less issue a directed threat toward him. *Sherk, supra* at 517-18, 614 A.2d at 227. Yet, the court still imposed a duty on the hospital and found it could be found liable for releasing the patient. *Id.* at 527, 614 A.2d at 232.

Moreover, *Leonard* and *Dunkle* only apply to the limited situation dealing with a psychiatrist's duty to warn. This is evident by the various other cases finding that doctors and hospitals could be held liable for a mental patient's infliction of injuries. See *e.g., McHale v. Cole,* 119 Pa. Commw. 334, 340, 547 A.2d 485, 487 (1988) (finding no sovereign immunity for hospital that refused to admit patient who later raped and beat plaintiff, and stating that hospital's decision not to admit may have been cause of injuries); *Evanuik v. University of Pittsburgh Western Psychiatric Institute & Clinic,* 234 Pa. Super. 287, 293, 338 A.2d 636, 639 (1975) (jury question whether hospital's negligence in failing to restrain patient who killed plaintiff's decedent was proximate cause of death). Thus, *Dunkle* and *Leonard* do not control here, and defendants owed a duty to the minor plaintiffs.

Defendants argue that this interpretation of *Goryeb, Sherk, Leonard* and *Dunkle* would expose physicians and hospitals to limitless liability. They also contend that this "fear" of liability will cause mental health physicians to commit patients more often which contravenes the legislative intent.[6] However, this effect is unlikely. As plaintiffs argue, the immunity provision of the Mental Health Procedures Act allows physicians

---

6. Defendants are referring to a portion of section 7102 entitled "statement of policy" which provides that "[t]reatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed." 50 P.S. §7102.

and hospitals appropriately to treat patients without the threat of liability.

In support of their argument that plaintiffs' proof of negligence was deficient as a matter of law, defendants next allege that plaintiffs did not sufficiently prove causation. They contend first that there was no evidence of injuries, and thus no evidence of causation, presented during the liability phase. However, the trial was bifurcated into a liability phase and a damages phase, and evidence on injuries or damages was prohibited in the first portion.

As plaintiffs argue, when considering a motion for judgment n.o.v., the court can consider all the evidence presented at trial and is not limited to evidence presented during one phase of a bifurcated trial. *Stevenson v. General Motors Corp.,* 513 Pa. 411, 422, 521 A.2d 413, 419 (1987). Further, a finding of liability in a bifurcated case is not a final decision upon which post-trial motions can be filed. *Id.* at 416, 521 A.2d at 416. Thus, the court can review the evidence presented in the damages phase in deciding the motion. There was ample evidence of plaintiffs' injuries presented in the damages phase. Patrick Odenbreit and April Mertz testified as to their recollection of the explosion and their resulting injuries. Harry Mertz did not testify at trial, but he showed his scars to the jury. Photographs depicting his burns were also shown to the jury. Further, Adrienne Creswell, M.D., director of the burn unit for St. Christopher's Hospital for Children, testified via videotape regarding the injuries Harry Mertz and Patrick Odenbreit sustained in the explosion. Thus, evidence of damages was certainly presented to the jury at some point during the trial.

Defendants also argue that plaintiffs' proof of causation was deficient as a matter of law. They contend that there was insufficient expert testimony linking the alleged gross negligence to plaintiffs' injuries. This argument must fail.

Plaintiffs' expert, Henry Pinsker, M.D., testified that the premature release of Mr. Litostansky increased the risk of danger to others. (Pinsker videotape deposition, pp. 42-43.) In accordance with Pennsylvania law, he stated the opinion within a reasonable degree of medical certainty. See *Montgomery v. South Philadelphia Medical Group Inc.*, 441 Pa. Super. 146, 155, 656 A.2d 1385, 1390 (1995) (requiring physician expert testimony to be rendered within reasonable degree of medical certainty). This testimony was sufficient under Pennsylvania law to send the issue of causation to the jury.

The Supreme Court has held that to present a prima facie case of causation in a medical malpractice case, the plaintiff can produce evidence that the defendant's conduct increased the risk of harm to a person in plaintiff's position and that the harm did occur. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 63-64, 584 A.2d 888, 892 (1990). Once a plaintiff has met that burden, "it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Id.* See also, *Hamil v. Bashline,* 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978) (jury question whether increased risk was substantial factor in causing plaintiff's harm).

Plaintiffs met their burden of proof here. Dr. Pinsker testified that Dr. Levine's failure to talk to Mrs. Litostansky before releasing her husband was "a flagrant departure from the standard of care." (Pinsker videotape deposition, p. 19.) He later opined that discharging Mr. Litostansky increased the risk of harm to others. (Pinsker videotape deposition, pp. 42-43.) He specifically stated that there was a danger to others because substance abusers and alcoholics often do dangerous things. (Pinsker videotape deposition, p. 43.) He also explained that Mr. Litostansky was getting worse, and intervention could have stopped the "downward progression." (Pinsker videotape deposition, p. 38.) As a whole, Dr.

Pinsker's testimony conveys the opinion within a reasonable degree of medical certainty that Dr. Levine should have admitted Mr. Litostansky, and Dr. Levine's conduct increased the risk of physical harm to the minor plaintiffs. Unquestionably, harm to the plaintiffs did occur. Thus, it was proper to send to the jury the question of whether defendants' conduct was a proximate cause of plaintiffs' injuries. See *Mitzelfelt, supra* at 68, 584 A.2d at 894-95 (discussing plaintiff's relaxed burden of proving causation in increasing risk of harm cases).

Defendants also allege that even if the causation testimony were sufficient, there was no proof that Mr. Litostansky was under the influence of drugs or alcohol when plaintiffs were injured. However, there was ample evidence presented for the jury to conclude that Mr. Litostansky was abusing drugs and/or alcohol on the day of his suicide. Mrs. Litostansky stated on cross-examination that her husband drank regularly and took drugs every day he could obtain them toward the end of his life. (N.T. 115.) On direct examination, she explained that Mr. Litostansky took drugs or drank alcohol almost every day during the last year of his life. (N.T. 80.) Thus, a jury could certainly find that the drugs and alcohol were partially responsible for his violent suicide. Accordingly, plaintiffs' proof of causation and negligence was not deficient as a matter of law, and the motion for judgment n.o.v. as to this issue was denied.

## B.

Defendants next argue that the court erred in permitting the opinion testimony of Dr. Pinsker. They further argue that this error entitles them to judgment n.o.v. Defendants' primary contention is that Dr. Pinsker's opinion contravened the Mental Health Procedures Act because he stated that Mr. Litostansky should have been admitted for detoxification.

Section 7102 of the Mental Health Procedures Act provides in relevant part that "[p]ersons who are mentally retarded, senile, alcoholic, or drug dependent shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves shall not be deemed to constitute mental illness." 50 P.S. §7102. Defendants argue that Dr. Pinsker did not state that Mr. Litostansky was suffering from a mental illness. Since he could not be admitted solely because of his alcohol and drug abuse, there was no proper basis to admit Mr. Litostansky. Thus, they conclude that defendants could not be grossly negligent in failing to admit Mr. Litostansky, and they are entitled to judgment as a matter of law. While this argument seems compelling on the surface, a closer examination reveals that Mr. Litostansky met the statutory criteria for commitment.

As discussed above, a person can be involuntarily committed when he or she is "severely mentally disabled." 50 P.S. §7301(a). Further, persons are classified as severely mentally disabled when their ability to exercise self-control or to care for themselves is so lessened that they pose "a clear and present danger of harm to others" or themselves. 50 P.S. §7301(a). The act goes on to outline the determination of clear and present danger. Relevant to Mr. Litostansky's case, the statute states:

"(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days: . . .

"(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; . . ." 50 P.S. §7301(b)(2)(ii).

The regulations further provide that a suicide attempt occurs when a person clearly articulates or demonstrates

an intention to commit suicide and has committed an overt action in furtherance of the intended action. 55 Pa. Code §5100.84(g).

When Mrs. Litostansky attempted to have her husband involuntarily committed, he had threatened to commit suicide and had written several suicide notes—each addressed to a different member of his family. (N.T. 83-89.) There is no authority in Pennsylvania holding that writing suicide notes cannot be considered an overt act in furtherance of the suicide. Moreover, Dr. Pinsker testified that writing several suicide notes indicates "a great sense of deliberation and seriousness of purpose about suicide." (Pinsker videotape deposition, p. 78.) "For somebody to sit down and write four notes or five notes suggests to me as a clinician that there is a serious, deliberate intent to commit suicide. This is not a casual or impulsive thing." (*Id.*)

Further, the jury took the relevant portions of section 7301 into consideration. The court instructed the jury that the germane parts of section 7301 outlined the criteria for committing someone against his or her will, and that their findings had to be consistent with the statute. (N.T. 751-53.) The jury thus considered the defendants' actions within its parameters. Based on the foregoing testimony, the jury could have easily concluded that Mr. Litostansky posed a clear and present danger to himself and could have been committed.

Moreover, Dr. Pinsker did not just state that Mr. Litostansky was abusing drugs and alcohol and should have been admitted on that basis. He stated that Mr. Litostansky demonstrated an immediate threat of suicide. (Pinsker videotape deposition, p. 78.) He also indicated that Mr. Litostansky was on a "downward spiral" and hospitalization helps depressed and demoralized patients. (Pinsker videotape deposition, pp. 38 and 30-31.) Therefore, Dr. Pinsker's testimony did not contravene the Mental Health Procedures Act, and there

was no error in allowing his testimony. Therefore, defendants' motion for judgment n.o.v. on this ground was denied.

## C.

In support of their motion for judgment n.o.v., defendants argue next that plaintiffs presented conflicting testimony of gross negligence. They allege that Dr. Pinsker did not unequivocally opine that Dr. Levine was grossly negligent and that the jury was left to guess between two contradictory opinions. This argument is meritless.

It was undisputed that in order for liability to attach, plaintiffs had to prove that defendants were grossly negligent in their failure to commit Mr. Litostansky. This higher burden of proving breach of duty was necessitated by the immunity provisions of the Mental Health Procedures Act. Section 7114 of the statute shields physicians and hospitals from civil and criminal liability for decisions concerning the treatment of mentally ill persons unless it is established that there was "willful misconduct or gross negligence." 50 P.S. §7114. Plaintiffs proved gross negligence by competent expert testimony.

Dr. Pinsker testified that Dr. Levine's failure to talk to Mrs. Litostansky, the petitioner, before discharging Mr. Litostansky was "a flagrant departure from the standard of care." (Pinsker videotape deposition, p. 19.) He further explained that knowledge of the type of conditions Mr. Litostansky would be returning to was critical in determining his well-being. (Pinsker videotape deposition, p. 20.) Finally, he stated that Mrs. Litostansky should have been afforded the opportunity to provide more information about her husband's state to the physicians. *(Id.)* Defendants argue that Dr. Pinsker contradicted himself later in his testimony, and this contradiction forms the basis for judgment n.o.v.

On redirect examination, Dr. Pinsker admitted that a doctor's review of the material on the patient's chart could be a substitute for interviewing Mrs. Litostansky, the petitioner. (Pinsker videotape deposition, p. 80.) However, he went on to state that it would not be a good substitute because it is not as useful or productive as a direct interview with the petitioner. (*Id.*) This statement about the chart being a possible substitute does not constitute a contradiction. If anything, the statement was an indicator of Dr. Pinsker's credibility. It is well-settled that it is the jury's province to assess the evidence and weigh the witness' credibility. *Dawson v. Fowler,* 384 Pa. Super. 329, 333, 558 A.2d 565, 567 (1989), *allocatur denied,* 523 Pa. 636, 565 A.2d 445 (1989). The jury's duty is no different with regard to expert witnesses. *Appeal of Avco Corp.,* 100 Pa. Commw. 616, 620-21, 515 A.2d 335, 338 (1986). The jury obviously believed Dr. Pinsker despite his slight "backing down" on redirect, and it cannot be faulted for doing so. See *Smith v. Shaffer,* 511 Pa. 421, 426, 515 A.2d 527, 529 (1986) (exclusive province of jury to assign weight to witness' testimony).

Defendants also argue that plaintiffs' case was insufficient as a matter of law because Dr. Pinsker did not articulate how talking to Mrs. Litostansky would have affected Dr. Levine's decision to discharge Mr. Litostansky. However, as discussed above in the section on causation, Dr. Pinsker stated that the failure to commit Mr. Litostansky increased the risk of harm to others. The failure to interview Mrs. Litostansky clearly led to the decision to discharge Mr. Litostansky. Thus, the chain of causation was established, and there was no conflicting evidence on gross negligence. Accordingly, defendants' motion for judgment n.o.v. on this issue was denied.

D.

Defendants next argue that they are entitled to judgment n.o.v. because the jury's verdict was against the

weight of the evidence. More specifically, they contend that there was no competent expert testimony that Mr. Litostansky met the criteria for involuntary commitment. They argue that Mr. Litostansky did not commit an overt act in furtherance of the intended suicide, and he thus did not pose a "clear and present" danger to himself.

Defendants face a heavy burden in seeking to overturn a jury verdict on the grounds that it is against the weight of the evidence. "The traditional standard for a weight of the evidence inquiry is whether the verdict is so contrary to the evidence as to shock one's sense of justice." *Smith v. Brooks,* 394 Pa. Super. 327, 344, 575 A.2d 926, 935 (1990), *allocatur denied,* 527 Pa. 625, 592 A.2d 45 (1991). Moreover, a court will uphold a jury verdict as conclusive as long as it is based on substantial evidence. *Standard Pipeline Coating Co. v. Solomon & Teslovich Inc.,* 344 Pa. Super. 367, 377, 496 A.2d 840, 845 (1985). Based on these standards, it is clear that the jury's verdict was not against the weight of the evidence.

As discussed more extensively above, Dr. Pinsker's testimony provided an ample basis for the jury to conclude that Mr. Litostansky should have been admitted to Temple. Further, the jury was justified in finding that writing four or five suicide notes, each addressed to a different member of the family, constituted an act in furtherance of the threat. In fact, Dr. Pinsker testified that writing several notes indicates "a great sense of deliberation and seriousness of purpose about suicide." (Pinsker videotape deposition, p. 78.)

Defendants argue that both Dr. Levine and their expert, Timothy Michals, M.D., testified that Mr. Litostansky did not commit an act in furtherance of suicide and thus did not meet the statutory criteria for involuntary commitment. However, in light of its province to weigh credibility, the jury was privileged to disbelieve

Drs. Levine and Michals. See *DeVita v. Durst,* 167 Pa. Commw. 105, 113, 647 A.2d 636, 640 (1994) (jury not required to believe all testimony presented to it), *allocatur denied,* 540 Pa. 606, 655 A.2d 993 (1995). The jury obviously weighed the conflicting expert testimony and sided with Dr. Pinsker.

Moreover, contrary to defendants' argument, there was sufficient expert testimony presented to the jury to warrant the finding that Dr. Levine should have reasonably foreseen the injury to plaintiffs. Dr. Pinsker opined that defendants' failure to adhere to the standard of care and admit Mr. Litostansky increased the likelihood of harm. (Pinsker videotape deposition, p. 36.) He further stated that substance abusers and alcoholics often do dangerous things. (Pinsker videotape deposition, p. 43.) Based on this testimony, it was reasonable for the jury to resolve the foreseeability issue in favor of plaintiffs. Therefore, it cannot be said that the jury's verdict "shocked the conscience" of the court, and the verdict was not against the weight of the evidence. Accordingly, defendant's motion for judgment n.o.v. on this ground was denied.

### III. MOTION FOR NEW TRIAL AND REMITTITUR

Defendants' remaining alleged points of error will be treated under this section. Defendants did not specify the relief sought for all of these alleged errors. However, if the arguments were meritorious, the proper remedy would be a new trial. Thus, the contentions will be discussed here. Defendants argue (1) the qualification of plaintiffs' expert in psychiatry was an abuse of discretion; (2) the court failed properly to instruct the jury, and it provided improper interrogatories to the jury; (3) the court erred in denying defendants' motion for a mistrial and (4) the verdict was excessive. In arguing that the verdict was excessive, defendants specifically request a new trial or, in the alternative, a remittitur.

It should first be noted that it is in the sound discretion of the trial court whether to grant a new trial. *Dorn v. Stanhope Steel Inc.,* 368 Pa. Super. 557, 581, 534 A.2d 798, 810 (1987), *allocatur denied,* 518 Pa. 656, 544 A.2d 1342 (1988). The court may grant a new trial when it committed an error of law which affected the outcome of the case. *Pollock Industries Inc. v. General Steel Castings Corp.,* 203 Pa. Super. 453, 201 A.2d 606 (1964). However, it is improper to grant a new trial because of a mere conflict in testimony. *Thompson v. City of Philadelphia,* 507 Pa. 592, 598, 493 A.2d 669, 672 (1985). Based on the above standards, defendants' motion for a new trial was denied.

## A.

Defendants first contend that the court abused its discretion in qualifying Dr. Pinsker as an expert in psychiatry. During Dr. Pinsker's voir dire, defense counsel elicited that Dr. Pinsker had never committed a patient under the Pennsylvania Mental Health Procedures Act. (N.T. 167.) Dr. Pinsker further admitted that he had no day-to-day working familiarity with the Act. (*Id.*) He also conceded that the law forms a basis for the relevant standard of care applicable to evaluating a patient for purposes of involuntary commitment. (N.T. 172.) Defendants contended at trial and continue to argue now that since Dr. Pinsker was not intimately familiar with the Pennsylvania law on involuntary commitment, he was not qualified to render an opinion on the appropriate standard of care. This argument must fail.

The decision as to whether a witness may be qualified as an expert rests with the trial court. *McDaniel v. Merck, Sharp & Dohme,* 367 Pa. Super. 600, 612, 533 A.2d 436, 440 (1987), *allocatur denied,* 520 Pa. 589, 551 A.2d 215 (1988). As defendants concede, the standard in Pennsylvania for qualifying a witness as an expert

is "liberal." *Montgomery v. South Philadelphia Medical Group Inc., supra* at 152, 656 A.2d at 1388. The witness must have knowledge not possessed by laymen, and the proposed testimony must assist the fact finder. *Id.* Moreover, the witness need only have a "reasonable pretension to specialized knowledge" on the subject of his testimony. *Id.*

Dr. Pinsker met the standard to be qualified as an expert. First, he stated on redirect examination during his voir dire that as a psychiatrist, he often participated in decisions to involuntarily commit people. (N.T. 180.) Further, the commitments were quite often based on determinations as to whether the persons posed an imminent danger of harm to themselves. (*Id.*) Although Dr. Pinsker's experiences were based on New York law, he explained that the Pennsylvania Mental Health Procedures Act is very similar to the New York statute with which he deals. (N.T. 165.) Dr. Pinsker also read the Pennsylvania statute and specifically noted the portions involving clear and present danger to oneself and the criteria for involuntary commitment. (N.T. 174.)

More importantly, as plaintiffs argue, Dr. Pinsker was testifying as an expert in psychiatry, not the law. He was familiar with suicide and with the standard of care governing psychiatrists. (N.T. 171-72.) He had dealt with involuntary commitment procedures and was certainly able to determine if persons were suicidal and posed a clear and present danger to themselves. It is well-established that expert witnesses do not have to precisely conform their testimony to statutory language. *Williams v. Dulaney,* 331 Pa. Super. 373, 383, 480 A.2d 1080, 1086 (1984). Moreover, the Pennsylvania Supreme Court has specifically stated that a medical expert need not formulate an opinion "before an open statute book." *Commonwealth v. Williams,* 432 Pa. 44, 50, 246 A.2d 356, 360 (1968). Thus, Dr. Pinsker's unfamiliarity with the Pennsylvania statute did not render him un-

qualified to be an expert in psychiatry. The court did not abuse its discretion in qualifying Dr. Pinsker, and defendants' motion for a new trial on this basis was denied.

## B.

Defendants allege next that the court failed to properly instruct the jury and provided improper interrogatories to the jury. The court's charge to the jury must accurately define the issues and correctly review the applicable law. *Cooper v. Burns,* 376 Pa. Super. 276, 283, 545 A.2d 935, 938 (1988), *allocatur denied,* 522 Pa. 619, 563 A.2d 888 (1989). However, the court is not required to use any prescribed language in formulating its charge and is not restricted to the precise points submitted by counsel. *Id.* Moreover, the court will not grant a new trial on the grounds of erroneous charges unless the instructions complained of are "fundamentally in error, and it . . . appear[s] that the erroneous instructions might have been responsible for the verdict." *Hawthorne v. Dravo Corp., Keystone Division,* 352 Pa. Super. 359, 368, 508 A.2d 298, 303 (1986), *allocatur denied,* 514 Pa. 617, 521 A.2d 932 (1987) (quoting *McCann v. Amy Joy Donut Shops,* 325 Pa. Super. 340, 342, 472 A.2d 1149, 1150 (1984) (en banc)). Based on the above standards, it is clear that there was no error in the instructions.

Defendants' first contention is that the court's instructions and interrogatories regarding duty, breach and causation centered around Mr. Litostansky rather than the minor plaintiffs. The court instructed the jury that "[p]rofessional negligence consists of a negligent, careless, or unskilled performance by a physician of the duties imposed upon him by his professional relationship with his patient." (N.T. 748.) Defendants allege that these instructions were erroneous because the issue in this case was the duty and breach owed to the plaintiffs, not the one owed to Mr. Litostansky. However, this argument must fail.

564

As plaintiffs argue, the jury was required to first consider Dr. Levine's gross negligence with regard to Mr. Litostansky before determining if there was a breach of duty to the plaintiffs. As explained in *Sherk v. County of Dauphin, supra* and *Goryeb v. Commonwealth, Department of Public Welfare, supra,* and as discussed more extensively above, if a physician or hospital commits gross negligence in the decision to discharge a person, the physician or hospital will be liable for the decision and any of its consequences. 50 P.S. §7114(a). In *Sherk* and *Goryeb,* the Supreme Court stated that "any of its consequences" indicates that the physician or hospital could be held liable to "others" that the released person harms. *Sherk, supra* at 527, 614 A.2d at 232; *Goryeb, supra* at 78, 575 A.2d at 549. This extended liability is appropriate because a person who "has been classified as a clear and present danger to himself and/*or* others constitutes a potential serious danger, not only to himself but to others." *Sherk, supra* at 527, 614 A.2d at 232. (emphasis added) Thus, the defendants' underlying duty was to Mr. Litostansky, and if they breached this duty by improperly treating him, they could be liable for the consequences. A logical and necessary step in analyzing the duty and breach thereof with regard to plaintiffs was the duty and breach thereof with regard to Mr. Litostansky. In light of the court's responsibility to instruct the jury on all applicable law, there was no error in charging the jury on duty and professional negligence as it related to Mr. Litostansky. See *Spearing v. Starcher,* 367 Pa. Super. 22, 29, 532 A.2d 36, 40 (1987) (describing court's duty to instruct jury on law applicable to case).

Moreover, the court properly charged the jury on causation and submitted appropriate interrogatories. The court instructed the jury on legal cause as follows:

"When we talk about legal cause and substantial factors, this is what we mean: A defendant-physician is

responsible or liable for the injuries suffered by his patient in this case if his gross negligence was the legal cause of the injuries. In order for grossly negligent conduct to be the legal cause, that conduct must have been a substantial factor in bringing about the injuries in question." (N.T. 750.)

This instruction in the liability phase was proper. Due to the bifurcated nature of the proceedings, it was proper for the jury to focus on Mr. Litostansky's injuries and causation in the first phase, which was the liability phase, of the trial. As per the bifurcation order, there was no testimony presented in the liability phase about the harm sustained by the plaintiffs. It would have been inappropriate for the jury to speculate on the legal cause of their injuries when the jury had heard no evidence concerning the plaintiffs.

The interrogatory concerning legal cause stated:

"(2) Was the gross negligence of Barry Levine, M.D. a substantial factor in bringing about Richard Litostansky's suicide and the explosion?"

This inquiry was proper as well. There was no dispute that the plaintiffs were injured by Mr. Litostansky's suicide. Plaintiffs' primary obstacle in proving causation was to establish that defendants' conduct caused the suicide. Once that causal link was found, there was no problem linking the suicide to plaintiffs' harm.

The court's instructions on causation correctly reviewed the necessary elements of legal cause. The interrogatory further outlined the requisite points. The jury was also instructed that plaintiffs had the burden of proving causation. (N.T. 750.) Thus, the jury was properly instructed on causation as it related to Mr. Litostansky. The jury deliberated on that point and found the gross negligence was a substantial factor in causing the suicide. Taking the analysis to its next logical step, the gross negligence caused plaintiffs' harm. Once again, due to the bifurcation, this was the appropriate method to establish causation, and there was no error.

Defendants also argue that the court erred in failing to charge the jury on superseding criminal acts and on legal cause as it relates to highly extraordinary or remote events. Defendants requested an instruction that an intervening criminal act of a third party may operate to be a superseding cause of plaintiffs' harm. (Defendants' requested point no. 17.) There was no error in refusing this charge.

The Pennsylvania Supreme Court has stated that violation of a criminal statute is not per se a superseding cause. *Powell v. Drumheller,* 539 Pa. 484, 495, 653 A.2d 619, 624 (1995). Rather, the jury can consider whether the intervening act rendered the result unforeseeable. *Id.* Moreover, the Pennsylvania Suggested Standard Jury Instructions §3.28, states that no instructions should be given on superseding or intervening cause. This is because these further charges often confuse the jury. *Id.* It is sufficient for the jury to determine whether the defendant's conduct was a substantially contributing factor to the alleged wrong. The court properly recognized that it owed no obligation to instruct the jury on this issue.

Likewise, the charge on legal cause covered the issue of highly extraordinary or remote events. The jury was instructed that plaintiffs did not meet their burden of proving causation unless they proved that defendants' gross negligence was a substantial factor in bringing about the suicide. (N.T. 750.) If the jury had found that Mr. Litostansky's conduct was a highly extraordinary or remote event, it would not have been possible to find that Dr. Levine's gross negligence was a substantial factor in bringing about the suicide.

Defendants based their requested instruction on *Dudley v. USX Corp.,* 414 Pa. Super. 160, 606 A.2d 916 (1992), *allocatur denied,* 532 Pa. 663, 616 A.2d 985 (1992). The court in *Dudley* stated that when the causal chain of events is so remote as to make it highly

extraordinary that the conduct could have brought about the plaintiff's injury, there is no proximate cause. *Id.* at 174, 606 A.2d at 923. The court went on to apply that rule to the facts present in that case and found that the causal chain of events leading to the harm was too remote to find that the conduct was a substantial factor in bringing about the harm. *Id.* Thus, the language regarding substantial factor contemplates an analysis of highly extraordinary events, and there was no error in refusing defendants' requested point.

Defendants next contend that the court erred in charging the jury on foreseeability and submitting an interrogatory on foreseeability in the damages phase of the trial. They argue foreseeability is an issue relating to duty and should have been presented to the jury during the liability phase. However, this argument must fail.

The point of the bifurcation was to preclude the emotion-stirring nature of the injuries from interfering with the jury's ability to make an objective evaluation of liability. Postponing the foreseeability issue was designed to effectuate this goal. A foreseeability analysis would have been improper during the liability phase when no evidence was presented regarding plaintiffs' harm.

Moreover, it was appropriate for the jury to consider foreseeability and duty in the second phase of the trial. Notwithstanding *Sherk* and *Goryeb,* once the jury found Dr. Levine was grossly negligent, and his conduct was a substantial factor in causing the suicide, the issue of foreseeability was ripe. As discussed above, the existence of a duty owed by a physician to a third party turns on the question of whether the third party's harm was foreseeable to the physician. *Crosby by Crosby v. Sultz, supra* at 543, 592 A.2d at 1343. See also, *Zanine v. Gallagher,* 345 Pa. Super. 119, 123, 497 A.2d 1332, 1334 (1985) (stating that it is those risks reasonably foreseeable by defendant that define scope of duty). Thus, the jury needed to consider foreseeability.

Further, due to the bifurcation and the underlying issues concerning breach of duty and causation with regard to Mr. Litostansky that needed to be established first, the foreseeability analysis was properly left to the second phase.

Defendants further argue that a foreseeability instruction and interrogatory was error because there was no evidence presented that plaintiffs' harm was foreseeable. However, this is simply not true. As previously observed, Dr. Pinsker testified that defendants' failure to treat Mr. Litostansky increased the risk of danger to other people because of the magnitude of Mr. Litostansky's problems. (Pinsker videotape deposition, p. 43.) He further explained that alcoholics and/or substance abusers often do dangerous things. (*Id.*) Based on this, the jury could conclude that Mr. Litostansky's committing suicide and injuring others in the process was reasonably foreseeable.

Defendants also allege error in the court's actual instruction. Defendants point to the part of the charge where the court stated "[y]ou're in some middle area here and you have to make a determination of whether what happened in those circumstances, given what happened at the hospital, whether this event was reasonably foreseeable." (N.T. 933.) Defendants objected to this statement, and the court gave a curative instruction. It specifically explained that it was not trying to imply where the case was on the spectrum of reasonable foreseeability or influence the deliberations in any way. (N.T. 941.) This instruction cleared up any possible misunderstanding. Thus, the charge on foreseeability was proper.

Defendants argue next that the court failed to instruct the jury that an act in furtherance of suicide for purposes of involuntary commitment must be an overt act. The court labeled 50 P.S. §7301 as an exhibit and sent it out with the jury. Section 7301 outlines the criteria

for involuntary commitment, and specifically explains that threats of suicide and acts in furtherance of the threat are necessary prerequisites to a finding of clear and present danger. 50 P.S. §7301(b)(2)(ii). It is true that the court did not charge the jury on the Pennsylvania Mental Health Regulations which specify that a suicide attempt consists of an intent to commit suicide and an overt act in furtherance of the intended action. 55 Pa. Code §5100.84(g). However, section 7301 fully and accurately conveyed the applicable law, and there was no error in failing to charge on the regulations. See *Geyer v. Steinbronn*, 351 Pa. Super. 536, 554, 506 A.2d 901, 911 (1986) (jury instruction need only be complete and correct).

Moreover, contrary to defendants' argument and as discussed more extensively above, there was ample evidence presented concerning an act in furtherance of the threat to commit suicide. Dr. Pinsker testified that writing several suicide notes suggests a "serious, deliberate intent to commit suicide." (Pinsker videotape deposition, p. 78.) The jury was justified in finding that writing suicide notes constituted an act in furtherance of the threat. Further, there was no error in the jury instructions or interrogatories, and the motion for a new trial on these grounds was denied.

### C.

Defendants argue next that they are entitled to a new trial because the court erred in denying their motion for a mistrial. On February 4, 1995, *The Philadelphia Inquirer* published a story about the Mertz trial. The article was located on the third page of the metro section and summarized the liability phase of the trial. However, the author also described how the minor plaintiffs were harmed and the extent of their injuries. Since this information had not been revealed to the jury through court testimony, defendants requested a mistrial alleging

that the article unfairly prejudiced the jury. The court denied the motion, and defendants now argue that this was error. Furthermore, it is alleged that the court erred by not giving detailed instructions to the jury about disregarding prejudicial evidence.

Upon inquiry, it was discovered that four jurors had read the article and another indicated he had heard about it. (N.T. 808.) To alleviate any speculation about jury misconduct, the court conducted voir dire on the issue. When asked if they could continue the trial, effectively putting the article out of their minds, all of the jurors responded that they had not been influenced by its contents. (N.T. 809.) Turning to both attorneys for any objections to the way voir dire was conducted and having received none from either side, the court continued with its scheduled proceedings.

It is fully within the court's discretion whether a new trial needs to be granted because jury members may have read prejudicial news articles. 10 Standard Pennsylvania Practice 2d §62:11 at note 64. After assessing the prejudicial impact of the newspaper article to be nonexistent, the court did not abuse its discretion in denying the motion for a mistrial. It is further noted that a court may grant a mistrial whenever it suspects a newspaper article has unduly influenced the jurors who must decide the case. 7 Standard Pennsylvania Practice §38:45. However, the mistrial may be properly refused where the jurors have read a newspaper article pertaining to the case, but have informed the court that their verdict will not be influenced. *Id.* at 199 (citing *Wilson v. Consolidated Dressed Beef Co.,* 295 Pa. 168, 145 A. 81 (1929)).

Here, the court had properly informed the jury in its initial instructions to disregard all evidence that was not properly admitted into the trial. (N.T. 31-32.) It further explained that it must disregard any preconceptions, misconceptions or prejudices that may enter into its decision-making process. (N.T. 31.) Thus, the

jury was aware at the beginning of the trial proceedings of its obligation to the court on hearing testimony.[7] As stated, the jurors who read the article informed the court that they would not be influenced by it.

In *Commonwealth v. Crispell,* 530 Pa. 234, 608 A.2d 18 (1992), the Supreme Court reviewed a case concerning the impact of a news article published during the course of a trial. The article was not inflammatory in nature, nor was it prominently located on the paper's front page. Though the lower court did not question the jurors about the article, the court held that the trial court did not abuse its discretion in failing to grant a mistrial. *Id.* at 244, 608 A.2d at 23. Furthermore, the court added that questioning jurors as a group or giving special instructions may be a sufficient precautionary measure depending on the facts of the case. *Id.* at 243, 608 A.2d at 22 (citing *Commonwealth v. Bruno,* 466 Pa. 245, 267-68, 352 A.2d 40, 52 (1976)).

Like *Crispell,* the news article at issue here was not inflammatory, sensational or highly prejudicial in nature to either party. While it did mention the degree of injury to each of the plaintiffs, the article did not attempt to dramatize the impact of the harm suffered by them. Recognizing the legitimacy of defendants' complaint, the court acted properly by only investigating the affected jurors. In fact, neither party challenged the way the inquiry was conducted. Thus, the court followed the guidelines set out in *Crispell* and did not abuse its discretion after deciding that the article did not have a prejudicial impact on the jury. See also, *Papa v. Pittsburgh Penn-Center Corp.,* 421 Pa. 228, 233, 218 A.2d 783, 791 (1966) (holding that decision to withdraw juror(s) from panel is left to trial judge's sound discretion).

In *Commonwealth v. Camperson,* 437 Pa. Super. 355, 650 A.2d 65 (1994), *allocatur denied,* 540 Pa. 646,

---

7. The jury was again reminded of its responsibilities and obligations at the end of the first day of trial. (N.T. 184-85.)

659 A.2d 984 (1995), the court held that the choice of procedure to ensure a fair trial in the face of prejudicial publicity is clearly within the sound discretion of the trial court. *Id.* at 361, 650 A.2d at 68. In *Camperson,* the defendant moved for a mistrial because of a newspaper story that made references to his background. *Id.* at 360, 650 A.2d at 67. After questioning the jurors who had read the article, the court opted to replace three of them. *Id.* at 361, 650 A.2d at 68. As the court stated, "questioning jurors as a group or giving special precautionary instructions may be a sufficient precaution depending on the facts of the particular case." *Id.*

There is little justification in jeopardizing an entire record of testimony when a potential problem can be isolated and easily remedied by the court. As *Camperson* noted, the court only needs to investigate those jurors who came into contact with the article and then decide whether they should be replaced by alternate jurors. *Id.* Lacking an indication that any of the jurors were prejudiced or a finding that the article was particularly harmful, the court acted well within its authority and discretion by denying the motion for mistrial. Thus, defendants' motion for a new trial on this issue was denied.

## D.

Lastly, defendants argue that the verdict was excessive warranting a new trial or, in the alternative, a remittitur. The grant or denial of a motion for remittitur based on an allegedly excessive verdict lies within the discretion of the trial court. *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 290, 285 A.2d 451, 456-57 (1971), *cert. denied,* 407 U.S. 920 (1972). More recently, the court stated that a jury award can only be reduced if it is "plainly excessive and exorbitant." *Haines v. Raven Arms,* 536 Pa. 452, 455, 640 A.2d 367, 369 (1994), *opinion supplemented,* 539 Pa. 401, 652 A.2d 1280 (1995). The award must be so excessive as to shock the court's sense of justice. *Id.* Further, Pennsylvania courts consider several factors in evaluating whether a jury award is excessive:

(1) the severity of the injury; (2) whether the injury is objectively ascertainable via physical evidence; (3) the permanency of the injury; (4) whether it is possible to continue with employment; (5) the size of out-of-pocket expenses and (6) the amount of compensation demanded in the original complaint. *Harding v. Consolidated Rail Corp.*, 423 Pa. Super. 208, 225-26, 620 A.2d 1185, 1193 (1993). The courts should only apply those factors that are relevant to the case at hand. *Id.*.

An analysis of the relevant factors indicates that the jury verdicts were not plainly excessive and exorbitant with regard to Patrick Odenbreit and Harry Mertz. However, after examining the evidence and the above considerations, it appears that the $500,000 award in favor of April Mertz was excessive. Her verdict was thus reduced to $250,000.

First, with regard to Patrick Odenbreit, his injuries were certainly severe. He testified that he woke up after the explosion under a pile of cabinets, furniture and bricks. (N.T. 830.) His legs were pinned down, and he could not move. (*Id.*) His back was on fire making him feel like "someone was squirting [him] with a hose with hot water." (N.T. 831.) It took about a half hour for the firemen to dig him out. (N.T. 833.) He was taken to St. Christopher's Hospital for Children by ambulance, and his shirt was melted to his back and had to be cut off. (N.T. 835.) He stated that the pain was so severe that it was "indescribable." (N.T. 836.) He remained in the hospital for almost five weeks while being treated for his burns. (N.T. 837.)

Adrienne Creswell, M.D., director of the burn unit at St. Christopher's Hospital, testified for the plaintiffs by videotape deposition. She stated that Patrick received second and third degree burns to 32 percent of his total body surface area. (Creswell videotape deposition, pp. 12-13.) To treat these deep serious burns, Patrick underwent several skin grafting procedures. (Creswell videotape deposition, p. 14.)

Patrick further testified that his back still hurt when he got out of the hospital, and he had to wear special undergarments for a year to flatten out the scars. (N.T. 839-45.) He went for follow-up treatment at St. Christopher's and was also treated at home by having cream and bandages applied to his burns daily. (N.T. 841.)

Second, the injuries were objectively ascertainable. There was no dispute that Patrick sustained severe burns, and photographs accurately depicting the damages were shown to the jury. Third, Dr. Creswell testified that Patrick's scars were permanent and were the raised, thick, hard and inflexible type of scars. (Creswell videotape deposition, p. 17.) She also explained that Patrick is required to have annual checkups to ensure he does not develop skin cancer. (Creswell videotape deposition, p. 25.)

Finally, it is clear that Patrick endured extreme pain and suffering in connection with his injuries. He stated that for four or five years his scars "would feel like it's pulling, ripping" if he stretched a certain way. (N.T. 845.) He wore a shirt in the swimming pool because he was embarrassed by his scars, and the other children used to tease him. (N.T. 845-46.) He said the kids called him Freddie Kruger (a character in horror films) and otherwise taunted him. (N.T. 846.) In light of the severity of his injuries and the physical and emotional pain that he sustained, it cannot be said that the jury's verdicts shocks the conscience of the court. Thus, there was no reason to set aside or reduce the verdict of $2.5 million to Patrick Odenbreit.

Likewise, the $2.5 million award to Harry Mertz was not excessive. Harry's injuries were also very severe. John Clark, a forensic investigator who was dispatched to the scene of the explosion, testified that Harry was buried under the burning rubble for about nine hours before the firemen dug him out. (N.T. 865.) He was taken to St. Christopher's Hospital where he remained for over a month. (N.T. 838.) He was only three and a half at the time of the explosion, and Patrick stated that his younger brother cried during the month

he was at the hospital. (N.T. 839.) Harry's whole body, except for his eyes, was covered with bandages. (N.T. 838.) He also had cream applied to him daily, even after he left the hospital. (N.T. 841.) Due to the scars on his legs, he limped when he was first released from the hospital. (N.T. 842.)

Dr. Creswell testified that Harry sustained second and third degree burns to the right back of his head, his neck, his right eyelid, both thighs and legs and the right side of his back. (Creswell videotape deposition, p. 19). He underwent several surgical procedures including an excision and grafting of his burns. (Creswell videotape deposition, p. 21.)

Second, Harry's injuries were also objectively ascertainable. He did not testify but he walked in front of the jury wearing shorts and showed them his scars. Photographs that accurately depicted Harry's condition when he was first released from the hospital were shown to the jury. Third, Dr. Creswell testified that Harry's scars were permanent. (Creswell videotape deposition, p. 22.) She further stated that the scar on his right thigh was completely numb, and the burns caused a large bald spot on the right side of his head. (*Id.*) He is also required to be evaluated yearly to ensure he does not develop skin cancer. (Creswell videotape deposition, pp. 23-24.)

As with Patrick, it is doubtful that Harry did not endure much physical and emotional suffering from the explosion. At only 3 1/2 years old, he was buried under burning rubble for nine hours. He spent over a month in the hospital undergoing complex grafting procedures, and Patrick remembered Harry crying while in the hospital. After sustaining these severe and permanent injuries, it cannot be said that a $2.5 million verdict shocks the court's sense of justice. Thus, the award was upheld.

Although April Mertz sustained injuries in the explosion, an analysis of the relevant factors in *Harding, supra* indicates that the $500,000 verdict in her favor was excessive. First, her injuries cannot be classified as severe.

April was about four years old when the explosion occurred. She sustained burns on her fingers, and her hair was burnt as well. (N.T. 858.) She remained in the hospital for three days. (N.T. 857.) Dr. Creswell did not present any expert testimony regarding April, and there was no evidence of any surgical procedures or extended recovery periods.

The jury was not shown any photographs of April, and her injuries were not objectively ascertainable via physical evidence. Third, her injuries were not permanent. She testified that her hair has all grown back, and her fingers are fine too. (N.T. 858.) She has no permanent scars, and there was no indication that she is required to have annual checkups.

However, April did sustain some injuries in the explosion, and there is no doubt that she was frightened by the event. She testified that she woke up crying after the explosion because she was scared. (N.T. 856-57.) Therefore, as the jury determined, April was entitled to be compensated for her harm. While $500,000 was excessive according to the factors above, it seems that a verdict of $250,000 would adequately compensate April without being exorbitant. Therefore, defendants' motion for a remittitur with regard to April was granted, and her award was reduced to $250,000.

## IV. DELAY DAMAGES

Within 10 days of the verdict, plaintiffs timely filed a petition for delay damages. Pursuant to Pa.R.C.P. 238, delay damages were appropriate in this case, and defendants did not oppose the award of delay damages. Plaintiffs' calculations for Patrick and Harry were correct, and the amount of delay damages added to each verdict was $698,441. Thus, the verdict in favor of Patrick Odenbreit was molded to $3,198,441, and the verdict in favor of Harry Mertz was also molded to $3,198,441.

Since the award in favor of April Mertz was reduced, the delay damages on her verdict was recalculated. The proper award of delay damages was $69,844, and the verdict was molded to $319,844 to reflect this.