

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-14-2007

# DeJesus v. US Dept Veterans

Precedential or Non-Precedential: Precedential

Docket No. 05-4952

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"DeJesus v. US Dept Veterans" (2007). *2007 Decisions.* Paper 1387.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1387

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 05-4952 and 05-5112

———

CAMILLE DeJESUS, INDIVIDUALLY AND AS
ADMINISTRATRIX OF THE ESTATE OF
ALEJANDRO DeJESUS, JR., DECEASED,
AND THE ESTATE OF
FELICIA LYNNE DeJESUS, DECEASED;
CHERYL FAULK, INDIVIDUALLY AND AS
ADMINISTRATRIX OF THE ESTATE OF
MICHAEL BRANDON FAULK, DECEASED,
AND THE ESTATE OF
AARON ASHANTI FAULK, DECEASED

Appellants, No. 05-5112

v.

UNITED STATES OF AMERICA
DEPARTMENT OF VETERANS AFFAIRS,

Defendant/Third-Party Plaintiff

PHILADELPHIA VETERANS MULTI-SERVICE
& EDUCATION CENTER, INC.;

LANDING ZONE II TRANSITIONAL RESIDENCE,

Third Party Defendant

United States of America
Department of Veterans Affairs,

Appellant, No. 05-4952

————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 02-cv-00253)
District Judge:  Honorable Paul S. Diamond

————

Argued December 13, 2006
Before:  FISHER, CHAGARES and
GREENBERG, *Circuit Judges*.

(Filed: March 14, 2007)

William G. Cole (Argued)
U.S. Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W., Room 7409
Washington, DC  20530

2

Joan K. Garner
Joel M. Sweet
Office of U.S. Attorney
615 Chestnut Street, Room 1250
Philadelphia, PA  19106
        *Attorneys for Appellant/Cross Appellee*
        *U.S. Department of Veterans Affairs*

Gerald A. McHugh, Jr. (Argued)
Regina M. Foley
Raynes, McCarty, Binder, Ross & Mundy
1845 Walnut Street, Suite 2000
Philadelphia, PA  19103
        *Attorneys for Appellees/Cross Appellants*
        *Camille DeJesus, etc., and Cheryl Faulk, etc.*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge.*

This case comes to us on appeal from the District Court's judgment in favor of Camille DeJesus ("Camille") and Cheryl Faulk ("Faulk"), plaintiffs and appellees in this case. Following a bench trial, the District Court determined that the U.S. Department of Veterans Affairs ("the VA") was liable on a theory of gross negligence for the shooting deaths of Camille's and Faulk's children by Camille's husband, Alejandro DeJesus, Sr. ("DeJesus"), just eighteen hours after he was released from

a residential housing facility located on the VA's grounds. On appeal, the VA argues that it had no statutory or common-law duty to protect the third-party children from DeJesus. Camille and Faulk cross-appeal, claiming the District Court erred in granting summary judgment to the VA on their failure-to-warn claims. For the reasons set forth below, we will affirm the judgment of the District Court.

I.

The tragic factual background to this case centers around DeJesus, an honorably discharged ex-Navy enlisted man. DeJesus was married to Camille, with whom he had three children, Alex, Jr. (age 22), Candida (age 19), and Felicia (age 6).[1] DeJesus had a history of domestic violence that culminated in 1997 when Camille obtained a Temporary Ex Parte Protection From Abuse Order requiring DeJesus to stay away from his son Alex, Jr. for one year, following an incident in which he allegedly struck Alex, Jr. repeatedly. Following the incident, DeJesus was arrested and placed in jail. While in jail, he attempted to hang himself by his shoelaces. After he was released, DeJesus had no home to which to return and began living on the street, occasionally visiting homeless shelters.

In September 1997, DeJesus voluntarily entered the VA Domiciliary Program as an unemployed, homeless veteran with substance abuse problems. The Domiciliary Program is an inpatient program designed to help veterans with the process of moving from homelessness and unemployment to being active

---

[1]Ages are at the time of the shooting.

members of the work force. Most patients in the Domiciliary Program spend approximately 90-120 days in the program and then attempt to transition back into the community. It is considered the least restrictive means of inpatient treatment at the VA.

At the time he entered the Domiciliary Program, DeJesus was initially evaluated by Dr. Edward Moon, a clinical psychologist working at the VA. Dr. Moon's evaluation found that DeJesus had a history of domestic violence, and, while DeJesus had denied depression, he admitted sadness and bordered on lability[2] when speaking of his estranged family. In addition, DeJesus indicated to Dr. Moon that while he was not currently suffering from any homicidal or suicidal thoughts, he previously had thoughts about hurting others and previously attempted suicide. Dr. Moon's report also suggested that unemployment and homelessness were "triggers" for DeJesus's destructive outbursts. During his time at the VA Domiciliary Program, DeJesus reported to a case manager that he was concerned because he had killed a man when in Vietnam and felt nothing while doing so.

Based on this information, Dr. Moon believed that DeJesus had intermittent explosive disorder. According to trial testimony, "[i]ntermittent explosive disorder is a disorder which involves some discrete incidents of either destruction or violence, those incidents are disproportionate to the stimulus, and those incidents do not occur or are not better explained by

_____

[2]Lability refers to emotional extremes – smiling at one minute followed by an immediate shift to sobbing.

another diagnosis, such as antisocial personality disorder . . . ." Individuals suffering from intermittent explosive disorder are generally not violent between episodes, only occasionally exhibiting violence or impulsiveness at a low level. Following violent episodes, those with the disorder often exhibit signs of calm and remorse. Persons with intermittent explosive disorder repeatedly react to the same stimuli and display the same response in each violent episode.

Following this preliminary evaluation by Dr. Moon, DeJesus saw a VA psychiatrist, Dr. Saul Glasner, who confirmed Dr. Moon's initial diagnosis of intermittent explosive disorder. Dr. Glasner prescribed twice-daily doses of 200 mg of Tegretol, an anti-convulsive medication which has been successfully used to control intermittent explosive disorder. A second VA psychiatrist, Dr. Tirso Vinueza, found that DeJesus was suffering from mild depression and would be seen on an "as needed basis." Because Dr. Vinueza was not informed that DeJesus was on Tegretol and did not read DeJesus's chart, he was unaware of Dr. Glasner's diagnosis of intermittent explosive disorder. No medication was prescribed for the mild depression. There is no indication in the record that DeJesus ever saw another psychiatrist during his stay at the Domiciliary Program.

After his psychiatric evaluation, DeJesus was assigned a "team" that would head up his treatment at the Domiciliary Program, including psychotherapy and substance abuse counseling. Although she was not DeJesus's original case manager (also called his primary therapist), Denise Outzs-

6

Cleveland came to take over that position.[3]  During his time at the Domiciliary Program, DeJesus attended group therapy sessions headed by Outzs-Cleveland and underwent therapy at one-on-one sessions.  At no time during her management of DeJesus's case did Outzs-Cleveland familiarize herself with DeJesus's medical history or become aware that he had been diagnosed with intermittent explosive disorder.  In addition, despite the fact that Outzs-Cleveland was treating DeJesus for substance abuse problems, she was never aware of what, if any, medications he was on.

After DeJesus completed approximately four-and-a-half months in the Domiciliary Program, Outzs-Cleveland recommended him for placement in Landing Zone II Transitional Residence ("LZ-II").  LZ-II is a program of the Philadelphia Veteran's Multi-Service and Education Center, which serves as a transitional program for veterans who may live and work at LZ-II for up to two years.  LZ-II is a privately run, non-profit organization that is funded by the VA Homeless Grant and Per Diem Program.  It is located on the grounds of the VA Medical Center at Coatesville in a building owned by the VA.  As part of its grant to LZ-II, the VA provides all medical and psychiatric services to LZ-II residents, including around-the-clock emergency medical and psychiatric care.  The VA also provides full-time police and fire services.  LZ-II staff members

_____

[3]Outzs-Cleveland has a Registered Nursing degree, but does not have a license to practice as she has twice failed the licensing exam.  Outzs-Cleveland does not have a license to practice therapy either, as the VA does not require it.

7

regularly consult with VA case managers and mental health workers regarding the residents.

Residents at LZ-II are subject to a number of restrictions. While they may leave the residence, they are required to sign in and out and must provide an account of their whereabouts. LZ-II residents may not keep alcohol in their rooms, which are subject to search by LZ-II at any time if the facility deems such a search necessary. LZ-II conducts weekly inspections of every resident's room.

While at LZ-II, DeJesus participated in a voluntary aftercare program, during which time Outzs-Cleveland was available to him for continued therapy. At the time DeJesus was admitted to LZ-II, Outzs-Cleveland had permission to release to LZ-II all personal information regarding DeJesus that she had in her possession, including his medical and psychiatric history. Despite this permission, Outzs-Cleveland never released any of this information to LZ-II. In fact, on her recommendation form for LZ-II, Outzs-Cleveland indicated that DeJesus had no mental health issues or behavioral problems, despite the evidence in the VA records that DeJesus had intermittent explosive disorder and suffered from violent outbursts and suicidal ideations.

On November 10, 1998, DeJesus contacted Outzs-Cleveland and informed her that he was engaged in court proceedings to seek partial custody of or, at least, visitation rights for his younger daughter, Felicia. At that time, he indicated that his estranged wife would not allow him any contact with her, and that his prior abusive behavior had led his older children, Alex, Jr. and Candida, to avoid contact with him. On January 15, 1999, DeJesus told Outzs-Cleveland that he was

8

"[g]etting quite frustrated with the court." Despite a letter Outzs-Cleveland wrote to the family court, DeJesus still had not gained custody over his daughter and, in addition, Candida and his wife had seen him at a custody hearing but refused to speak to him. He expressed his gratitude to Outzs-Cleveland that he was "in this facility to vent his feelings and maintain his sobriety."

On February 12, 1999, Outzs-Cleveland received a phone call from a man requesting to speak to Camille. Outzs-Cleveland recognized DeJesus's voice and realized that he had mistakenly called her while trying to contact his estranged wife. Her log entry following the conversation read:

> Phone rang around 1500 [hours] and the person on the other end asked for Camille. Responded saying they had the wrong number and then recognized the voice to be familiar. Asked if it was A. DeJesus and this veteran responded, "Yes." Mr. DeJesus was trying to call Media to contact his estranged wife and had some[how] called the 7A do[r]m. Learned that he had just been served his divorce papers and he was *very distraught* on the phone. Talked briefly and *asked him to see undersigned [Outzs-Cleveland] ASAP* to process his feelings and talk. He said he would call back.

(Emphasis added.) DeJesus never called back and Outzs-Cleveland never undertook any follow-up.

On March 22, 1999, DeJesus was working in the kitchen at LZ-II, preparing breakfast with other residents. DeJesus

9

entered into a verbal confrontation with another LZ-II resident, Bill Queen, over a dirty bucket of water. While residents' versions of the events differed, all agreed that at some point during the altercation, DeJesus picked up a knife, held it behind his back, and Queen felt threatened. The knife incident only lasted a matter of minutes, and, while DeJesus did not injure anyone, the knife had to be forcibly removed from his hands.

After the altercation, LZ-II contacted Outzs-Cleveland and Bruce Newell, Queen's therapist, to discuss the situation. The VA recommended that DeJesus be discharged. While LZ-II claimed it was under no obligation to follow the VA's recommendation regarding his dismissal from the program, it relied heavily on the VA staff's advice and would not have dismissed DeJesus but-for the VA's recommendation. DeJesus was involuntarily discharged from the LZ-II program for "creating a physical threat with a weapon." After he was told that he would be discharged from LZ-II, DeJesus was "quiet" and said he would leave. Before he left, DeJesus met Outzs-Cleveland, said that he loved her, gave away a number of his personal possessions, and informed several people that he would be walking to Maine or New Hampshire.

At this time, Outzs-Cleveland expressed concern over DeJesus's mental well-being and offered twice to take DeJesus to seek a psychiatric evaluation. He declined both times. After DeJesus declined to be seen, Outzs-Cleveland contacted Dr. Stephen Chambers and Dr. Christopher Ray, two VA psychologists, to inquire as to whether she could require DeJesus to seek counseling before he left. Despite the existence of involuntary commitment procedures at the VA, they both informed her that he could not be forced to be seen because he

10

was an outpatient. However, when she asked them, she did not inform them that DeJesus was giving away his possessions or inform them about his prior history of domestic abuse and suicidal ideations, often triggered by a change in job or home situation. Had she informed him of that information, Dr. Chambers believed he may have suggested she have DeJesus involuntarily committed.

In her write-up following the incident, Outzs-Cleveland wrote:

> [DeJesus] didn't quite understand or refused to understand the seriousness of picking up this knife to use as a weapon. He was offered twice during meeting to be escorted over to Bldg 2 to outpatient to have a STAT Psychiatric Consult. Mr. DeJesus did not want to utilize this offer of support and just said he would leave today after he gave a few of his items away to current LZ-II residents. He stated he would be walking to New Hampshire or Maine. *Concern arose by undersign[ed] for him to be seen due to his past history of wanting to hurt others, particularly his estranged wife who recently served him divorce papers and has not allowed contact with youngest daughter for over a year. He is in a custody battle with wife. He has also in past had thoughts of hurting self.*

(Emphasis added.) At no point on March 22 did DeJesus make any specific threats against his wife or children.

11

Following DeJesus's release from LZ-II, the LZ-II staff conducted a search of DeJesus's room and found that he had shredded much of his clothing, including a baseball cap that was of particular importance to him. Despite the fact that this behavior is consistent with suicidal tendencies, no one who was called to consult thought to make use of Pennsylvania involuntary commitment procedures or emergency psychiatric intervention under the VA's internal procedures.

DeJesus left LZ-II sometime on the afternoon of March 22. Approximately eighteen hours later, on March 23, DeJesus charged through the door of Camille's apartment and shot two of their children, Alex, Jr. and Felicia, and two neighbor children, Aaron Faulk and Michael Faulk. Alex, Jr., Felicia and Aaron Faulk died immediately. Michael Faulk died two days later in the hospital. After shooting the four children, DeJesus turned the gun on himself. Upon hearing about an incident involving a man killing his children and then himself on the news, Outzs-Cleveland immediately thought it was DeJesus.

## II.

On January 16, 2002, Camille and Faulk instituted a suit against the United States, the VA, the Philadelphia Veterans Multi-Service Center, and LZ-II[4] under the Federal Tort Claims Act ("FTCA") individually and on behalf of the estates of their children for the March 23 deaths. The Complaint included claims for: (1) The VA's gross negligence in discharging or

[4]The Philadelphia Veterans Multi-Service Center and LZ-II are not participating in this appeal.

failing to treat DeJesus when he was an imminent threat, (2) failure to warn, (3) wrongful death and (4) negligent infliction of emotional distress.

The District Court granted the VA's motion for summary judgment on the plaintiffs' failure-to-warn claims on February 17, 2005, finding that a mental healthcare provider only has a duty to warn if a "patient communicates a specific and immediate threat of serious bodily injury against a specifically identified or readily identifiable third party." Following the conclusion of pre-trial motions, the District Court heard the remaining claims without a jury.

At trial, the plaintiffs presented an expert, Dr. Robert Lloyd Goldstein, who testified that DeJesus's behavior leading up to the shootings was very consistent with someone suffering from intermittent explosive disorder. He stated that the phone call to Outzs-Cleveland indicated the beginning of a crisis. He further testified that the incident with the knife was a sign of decompensation (or deterioration). DeJesus's diagnosis as having intermittent explosive disorder "indicated . . . his propensity to have explosive outbursts . . . Under the circumstances it was certainly something to pause and be concerned about." In situations like the one presented following the knife incident, Dr. Goldstein stated that it is imperative to take into account a patient's history when making treatment decisions. He believed that the VA grossly failed in its duty in this regard as no one was familiar with DeJesus's full medical history when someone should have been.

Dr. Goldstein also testified that, under the circumstances, DeJesus should not have been released. His willingness to give

13

away his personal belongings indicated a propensity for suicidal behavior. Further, anyone familiar with DeJesus's tendency to have violent outbursts after facing frustration in his home or work life should have known that to expel him from LZ-II was, in effect, to expel him from his job and to completely isolate him from his support system not long after he learned he would be getting divorced. Dr. Goldstein stated that to do so would be to take someone who is already in crisis and seriously compound that crisis. The failure to share readily-available information, the failure to correctly recognize DeJesus's suicidal tendencies, and the failure to prevent DeJesus's release constituted gross negligence.

The VA also presented an expert witness, Dr. Brooke Zitek, who testified regarding involuntary commitment procedures in Pennsylvania. She testified that most patients who are involuntarily committed are suffering from much more severe psychotic episodes than DeJesus. "[T]he person is totally lacking in terms of their [sic] judgment and their [sic] insight into their [sic] illness." She did not believe that DeJesus's behavior during the knife incident created a "clear and present danger" as required by Pennsylvania commitment procedures. Other than the February 4 phone call and the March 22 knife incident, Dr. Zitek did not believe that DeJesus had exhibited any behavior that indicated a serious demeanor change.

On cross examination, Dr. Zitek admitted that, of the factors typically considered in determining whether a psychiatric emergency existed, all of them applied to DeJesus. DeJesus also exhibited several signs indicating a tendency toward suicide. She also testified that "ideally the therapist would have known [DeJesus's] diagnosis." However, Dr. Zitek maintained her

14

position that the VA did not grossly deviate from the standard of care. In its final decision, the District Court stated that it found Dr. Goldstein credible while Dr. Zitek's testimony was equivocal and unconvincing.

Following testimony, the District Court found sufficient evidence to enter judgment against the VA, finding it was grossly negligent in its determination that DeJesus should be discharged from LZ-II and in its failure to commit DeJesus following the discharge. These violations of the appropriate standard of care proximately caused the shooting deaths of the four children. Therefore, the District Court awarded damages to Camille and Faulk individually and on behalf of the estates of their children for gross negligence and wrongful death. Additionally, the District Court found that Camille had proven the necessary elements for negligent infliction of emotional distress and awarded her additional damages on that claim.

## III.

The District Court had jurisdiction over this FTCA claim pursuant to 28 U.S.C. § 1346(b). We exercise jurisdiction over this appeal from a final judgment of the District Court pursuant to 28 U.S.C. § 1291. We review the legal decisions of a district court conducting a bench trial *de novo*, but "[f]indings of fact shall not be set aside unless clearly erroneous and due regard must be given to the trial court's judgments as to the credibility of the witnesses." *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006) (citing Fed. R. Civ. P. 52(a)). Because the liability of the United States under the FTCA is determined by the law of the state where the allegedly tortious act occurred, 28 U.S.C. § 2647, we will look to the state

15

courts to determine how to resolve the underlying legal issues. If there is no applicable decision from the state's highest court, we are charged with predicting how that court would resolve the issue, considering "(1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issue." *Id.* (internal citations omitted). We "must attribute significant weight to these [lower state court] decisions in the absence of any indication that the highest state court would rule otherwise." *Id.* Because the conduct in question took place in Pennsylvania, its law properly governs this action.

IV.

The primary issue that we are presented with is whether the VA had a duty under Pennsylvania law to protect the third parties who were killed when DeJesus was released from LZ-II. Because Camille and Faulk have cross-appealed the District Court's decision to grant the VA summary judgment on their failure-to-warn claims, we begin our analysis with the Pennsylvania Supreme Court's decision in *Emerich v. Philadelphia Center for Human Development, Inc.*, 720 A.2d 1032 (Pa. 1998). Taking its cue from the California Supreme Court's landmark decision in *Tarasoff v. Regents of the University of California*, 551 P.2d 334 (Cal. 1978), the Pennsylvania Supreme Court recognized that, while there is generally no duty to control the conduct of a third party, where the defendant stands in a special relationship to the victim or some other party, the victim deserves protection. *Emerich*, 720 A.2d at 1037. Therefore, the Court held that when a mental health professional determines that her patient presents a serious

16

danger of violence to another, that mental health professional has an affirmative duty to warn the intended victim. *Id.* at 1039-40.

However, recognizing that to read that duty too broadly would result in crippling an already heavily-burdened profession, the Pennsylvania Supreme Court carefully delineated its application. Before a mental health provider has a duty to warn or otherwise protect a third party from a threat presented by a patient in her care, the threat must be a specific and immediate threat of serious harm, and the victim must be readily identifiable. *Id.* at 1041.

In their cross-appeal, Camille and Faulk make a novel argument regarding why the VA had a duty to warn Camille of her husband's behavior. However, this is a clear case where *Emerich* does not apply. Camille and Faulk agree that there was no specific threat of immediate harm made against Camille or her children before DeJesus left LZ-II. Rather, they argue that because Outzs-Cleveland wrote a letter to the family court attesting to DeJesus's improved mental health, the VA then had a duty to inform any person who may have relied on that letter if DeJesus's mental health state changed. However, the outcome of court proceedings can affect numerous parties, and it would be very difficult to identify all persons who would have relied on Outzs-Cleveland's letter. Because of the Pennsylvania Supreme Court's narrow reading of failure-to-warn claims, we do not believe that, given the opportunity, it would expand

17

*Emerich* to a situation that involves no specific threat of immediate harm against a readily identifiable victim.[5]

---

[5]We also note that Camille's and Faulk's reliance on *Cipriani v. Sun Pipeline Co.*, 574 A.2d 706 (Pa. Super. Ct. 1990), and *Schwartz v. United States*, 230 F. Supp. 536 (E.D. Pa. 1964), is misplaced. In both cases, the court found that a defendant who had created a risk of harm was under a duty to prevent that harm from taking effect. *Cipriani* relied on Section 321 of the Restatement (Second) of Torts, which provides that where an actor has created a risk of harm, the actor is under a duty to exercise reasonable care to prevent the risk from taking effect. Restatement (Second) of Torts § 321. While the Pennsylvania Supreme Court has never adopted Section 321, *Glick v. Martin & Mohler, Inc.*, 535 A.2d 626, 629 (Pa. Super. Ct. 1987), even if it had, this case would not be an appropriate Section 321 action. Unlike the plaintiffs in *Cipriani* and *Schwartz*, the parties who were likely to be affected by Outz-Cleveland's letter to the family court are not easily identifiable. To use Section 321 to expand the limited duty in *Emerich* to cases where an affirmative statement by a mental health worker *may* affect some unidentified party would impose a vague and unworkable standard. As the California Supreme Court said in *Tarasoff*, application of Section 321 liability in situations such as this raises "difficult problems of cauastion and of public policy." *Tarasoff*, 551 P.2d at 349 n.18. Therefore we do not believe the Pennsylvania Supreme Court would impose liability on the VA based on Section 321 of the Restatement.

18

V.

As the District Court did not base its judgment against the VA on a failure-to-warn claim, we next address whether Camille and Faulk appropriately recovered because the VA owed a different duty to their children. In all tort cases, a duty may be imposed either through common-law case development or through statute. *Emerson v. Adult Cmty. Total Servs., Inc.*, 842 F. Supp. 152, 155 (E.D. Pa. 1994); *see Serbin v. Ziebart Intern. Corp., Inc.*, 11 F.3d 1163, 1167-68 (3d Cir. 1993) (looking to both statute and common law to determine existence of a duty). We therefore look to both kinds of duties to determine the scope of the VA's duty to the third-party victims in the case before us.

A.

While the Pennsylvania Supreme Court has not specifically addressed the common-law duty to protect third parties in situations other than failure to warn, the Pennsylvania Superior Court has twice stated that there is no common-law duty to protect third parties in situations like the one presented here. In *F.D.P. v. Ferrara*, 804 A.2d 1221 (Pa. Super. Ct. 2002), the parents of a girl who was sexually assaulted by a resident of a mental health facility brought suit against the operators of that facility. They alleged, *inter alia*, that the mental health facility was negligent in failing to seek a civil commitment of the resident, who had a long history of sexual misconduct. *Id.* at 1225. The court found that there was no general duty to control the conduct of a third party to protect another from harm "unless there is a special relationship . . . that imposes a duty upon the actor to control the third person's

19

conduct or unless there is a special relation between the actor and the other . . . ." *Id.* at 1228. No such duty existed as to the facility. Further, the court declined to adopt Section 319 of the Restatement, which imposes a duty to prevent a third-person from doing harm on "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled." Restatement (Second) Torts § 319. Based on balancing policy considerations,[6] the court stated:

> If we allow recovery against mental health and mental retardation providers for harm caused by patients except in the clearest circumstances, we would paralyze a sector of society that performs a valuable service to those in need of mental health care. Thus, we decline to impose a duty of ordinary care under Restatement (Second) of Torts [Section] 319 on providers of mental health and mental retardation services.

*Id.* at 1232; *see also Heil v. Brown*, 662 A.2d 669, 671 (Pa. Super. Ct. 1995) (refusing to find common-law duty where a

---

[6]These considerations include: "'(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and the foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; (5) the overall public interest in the proposed solution.'" *Ferrara*, 804 A.2d at 1231 (quoting *Brisbine v. Outside in Sch. of Experiential Educ., Inc.*, 799 A.2d 89, 95 (Pa. Super. Ct. 2002)).

20

police officer was struck by a vehicle driven by a patient receiving voluntary outpatient care from the defendant health institution).

We find this reasoning compelling and believe that, given the opportunity, the Pennsylvania Supreme Court would adopt a similar approach.[7]  It is unlikely that the Pennsylvania Supreme Court would adopt a general common-law duty to commit a patient or otherwise protect third parties from a mental health patient absent a special relationship.  Therefore, liability cannot be based on a common-law duty owed to the four victims in this case.

---

[7]Dicta in *Emerich* suggests that there may be a duty greater than simply the duty to warn.  For example, the Supreme Court indicated that mental health care professionals maintain a special relationship with their patients.  *Emerich*, 720 A.2d at 1037.  It also referred to Section 319 of the Restatement (Second) of Torts, which it cited "with approval" in its decision in *Goryeb v. Pennsylvania Department of Public Welfare*, 575 A.2d 545, 549 (Pa. 1990).  While this discussion indicates that the Pennsylvania Supreme Court sees some value in imposing a duty to control dangerous patients on mental healthcare providers who take charge of these patients, there is no indication that the Supreme Court would expand such a duty to such an extent as to find a common-law duty to commit in a situation such as the one presented here.

21

B.

However, duties that give rise to claims sounding in tort are not found only in common-law decisions. In 1976, the Pennsylvania legislature passed the Mental Health Procedures Act ("MHPA"). P.L. 817, No. 143 (1976). The relevant portion reads:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 Pa. Cons. Stat. § 7114(a).

Taking the converse of the statutory language, the Pennsylvania Supreme Court has found an affirmative duty exists requiring that mental health institutions avoid gross negligence or willful misconduct in the treatment of mental health patients. *Sherk v. Dauphin*, 614 A.2d 226, 232 (Pa. 1992). In the landmark case on the MHPA, *Goryeb v. Pennsylvania Department of Public Welfare*, 575 A.2d 545 (Pa.

1990), the Pennsylvania Supreme Court held that the act's language, which limits liability, also expressly creates a duty:

> When a Commonwealth party participates in a decision that a person be examined, treated or discharged pursuant to the Mental Health Procedures Act, such a party shall not be civilly or criminally liable for such decision or for any of its consequences except in the case of willful misconduct or gross negligence. Conversely, and most importantly to the instant case, a Commonwealth party participating in a decision to examine, treat or discharge a mentally ill patient within the purview of the Mental Health Procedures Act who commits willful misconduct or gross negligence can be liable for such decision.

*Id.* at 548-49 (emphasis added).

The Supreme Court further explicated the scope of the duty created by the MHPA. The language in the MHPA states that no liability will be imposed for the decision itself "or for any of its consequences." 50 Pa. Cons. Stat. § 7114(a). "Clearly, the words 'any of its consequences' indicate the legislative recognition that discharging a severely mentally disabled person . . . is a potential serious danger not only to the patient himself but to 'others.'" *Goryeb*, 575 A.2d at 549. Therefore, whenever a plaintiff can prove that the hospital failed to meet its duty to refrain from gross negligence in decisions regarding treatment, discharge or commitment of a patient, the hospital is liable for injury "'to the person or property of third

23

parties where such injury resulted from a hospital's negligent failure to meet its responsibility.'" *Id.* (quoting *Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1240 (Pa. 1983)); *see also Sherk*, 614 A.2d at 232.

Based on *Goryeb* and *Sherk*, the Superior Court in *Ferrara* found that there was a duty created by the Mental Health and Mental Retardation Act, an act similar in structure and purpose to the MHPA. *Ferrara*, 804 A.2d at 1233. The court held that the Guidance Center, a non-profit organization that provided only guidance to the residents of Group Home, had a duty to refrain from gross negligence. *Id.* at 1233.[8] Therefore, if LZ-II is a facility covered by the MHPA, then the VA had a duty to refrain from gross negligence in its treatment and discharge decisions regarding DeJesus.

1.

The first question that presents itself under the MHPA is whether Outzs-Cleveland and the other VA parties involved in DeJesus's release from LZ-II are subject to the MHPA. The VA argues that, in this instance, they were not.[9] The MHPA applies

_____

[8]The court ultimately found that the Guidance Center had not behaved in a grossly negligent manner.

[9]Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties. *United States v. Olson*, 546 U.S. 43, 43 (2005) (holding that the federal government cannot be held liable for violating duties that are imposed *solely* on state governments acting in their peculiar positions as governments). In this case,

24

to physicians or other authorized persons who "participate in" a decision to treat or examine a person under the act, or a decision regarding discharge.[10] 50 Pa. Cons. Stat. § 7114. "Treatment" is defined as "diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery." 50 Pa. Cons. Stat. § 7104. It is uncontraverted that Outzs-Cleveland treated DeJesus. As his primary therapist, Outzs-Cleveland undertook therapy sessions with DeJesus, provided him support, and helped him deal with his substance abuse problems.

Further, both Outzs-Cleveland and Dr. Chambers participated in the decision to discharge DeJesus from LZ-II. While the VA has argued that it was LZ-II, not the VA, that ultimately decided to discharge DeJesus, the District Court found that the VA and its employees were key players in all decisions LZ-II made regarding DeJesus, particularly in the decision to release DeJesus from LZ-II. We can reverse this

---

the VA has conceded that the MHPA applies to it even if the MHPA is written so as to apply only to governmental entities in Pennsylvania. If there is a duty in these circumstances under the MHPA, the VA agrees that the duty applies to it. Therefore, we do not engage in an analysis of whether providing mental health assistance and committing patients is a duty that is peculiar to Pennsylvania state mental health facilities as governmental entities.

[10]Discharge is not defined under the MHPA.

25

determination only if it is clearly erroneous. *Miller v. Phila. Geriatric Ctr.*, 463 F.3d 266, 270 (3d Cir. 2006). Based on the fact that LZ-II consulted the VA staff extensively before making a decision to release DeJesus and that the VA provided all mental health care to LZ-II residents, we find that the District Court did not err in its determination that the VA, and not LZ-II, was primarily responsible for the decision to release DeJesus.

However, determining that the VA provided physicians and other authorized persons who participated in decisions regarding DeJesus's ultimate discharge does not bring it within the MHPA. Rather, the VA is only liable under the duty imposed by the MHPA if DeJesus was a patient at an appropriate facility. The MHPA applies to "involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons." 50 Pa. Cons. Stat. § 7103. Pennsylvania courts have held that the MHPA does not apply to voluntary outpatient treatment. *Emerich*, 720 A.2d at 1038 n.7; *see also Chartiers Comm. Mental Health & Retardation Center, Inc. v. Dept. of Pub. Welfare*, 696 A.2d 244, 247-48 (Pa. Commw. Ct. 1997).

Prior to trial, both parties stipulated to the fact that, when he was at LZ-II, DeJesus was receiving *outpatient* treatment from the VA. However, that stipulation is not dispositive. In the case before us, we are not examining the VA's decision to discharge DeJesus from the voluntary, outpatient treatment he was receiving from Outzs-Cleveland and others at the VA. Rather, we are examining the VA's decision to have LZ-II release DeJesus from the community in which he had been living for over a year. Nothing in the MHPA requires that the physician or other authorized person actually work for the

26

inpatient facility where the patient is located. Rather, it requires that a physician or authorized person "participates in" a decision to treat or discharge the patient. Therefore, if DeJesus was an inpatient at LZ-II, and the VA participated in a decision to treat or discharge him, it may still be liable under the MHPA for improperly suggesting that LZ-II discharge DeJesus and then failing to commit him.

Whether a community living facility like LZ-II constitutes a facility that provides inpatient treatment is a question of first impression for this Court and the Pennsylvania courts. As in all cases that depend on statutory interpretation, we begin with the language of the statute. Under the MHPA:

> "Inpatient treatment" shall include all treatment that requires full or part-time residence in a facility. For the purposes of this act, a "facility" means any mental health establishment, hospital, clinic, institution, center, day care center, base service unit, community mental health center, or part thereof, that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as inpatients or outpatients.

50 Pa. Cons. Stat. § 7103.

Generally, the terms of the MHPA have been broadly construed by Pennsylvania courts.[11]  For example, in *Allen v.*

---

[11]The VA agreed to broad construction in its opening brief submitted to this Court. "[T]his protection granted to mental health workers is to be construed broadly . . . ."

27

*Montgomery Hospital*, 696 A.2d 1175 (Pa. 1997), the Pennsylvania Supreme Court ruled that the limited liability provision of the MHPA extended to care given by a physician in a hospital for physical ailments plaguing a mentally ill patient. "[T]he General Assembly did not intend to limit treatment to that only directly related to a patient's mental illness. Instead, treatment is given a broader meaning in the MHPA to include medical care coincident to mental health care." *Id.* at 307. The broad construction of the MHPA guides our interpretation of the inpatient requirement and leads us to believe that the Pennsylvania Supreme Court would find that, under the specific facts of this case, LZ-II was providing inpatient treatment to DeJesus.

The District Court found the following facts: LZ-II had rules by which its residents must abide to continue living there; LZ-II residents were prohibited from having alcohol in their rooms; residents at LZ-II were required to sign in and out of the facility; LZ-II oversaw residents' finances to ensure residents were being fiscally responsible; LZ-II reserved the right to conduct room searches at any time and conducted actual searches on a weekly basis; as an LZ-II resident, DeJesus took part in group therapy sessions and continued counseling in substance abuse; as an LZ-II resident, DeJesus had around-the-clock mental health help available to him; DeJesus had continued access to his primary therapist. Based on these specific facts, we conclude that DeJesus was an inpatient within the meaning of the MHPA.

DeJesus was not simply residing in an apartment subsidized by LZ-II. Rather, he was a resident at a facility that closely monitored nearly every aspect of his life: his job, his

28

daily movements, his finances, and his mental well-being. Even his ability to retain his place of residence rested on his continued willingness to abide by rules that limited his freedom and involved a substantial reduction in his personal privacy. LZ-II, in addition to providing DeJesus with a place to live, provided him, through its contract with the VA, with 24-hour access to mental health care, continued individual and group therapy, and lessons in the life skills necessary for a recovering substance-abuser with a history of mental instability to transition to life outside the controlled walls of LZ-II. The combination of the restrictions imposed on DeJesus and the services provided by LZ-II make it an "institution . . . that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as outpatients or inpatients." 50 Pa. Cons. Stat. § 7103.

Even if LZ-II could not be termed an institution that provides treatment of mentally ill persons in and of itself, it is still a qualifying facility under the MHPA. Section 7103 includes in its definition of facility "any mental health establishment . . . or *part thereof*" that treats mentally ill persons. *Id.* (emphasis added). While LZ-II is a privately run group home, its location, organization and funding make it "part of" the VA Coatesville compound, which is clearly a qualifying facility. LZ-II operates primarily on grant money from the VA. It is located on the VA Coatesville property in a building owned by the VA. It has a contract with the VA in which the VA provides medical and psychiatric services as well as fire and police protection. LZ-II conferences regularly with VA counselors, psychologists, and psychiatrists regarding the treatment of LZ-II residents, and the VA commonly transfers patients from its inpatient Domiciliary Program to LZ-II as a

29

way for those patients to transition to life outside the facility. These factors are sufficient to show that LZ-II was not an isolated residential facility, but rather a part of an integrated campus designed to serve the total health of veterans. Therefore, at a minimum, LZ-II is "part of" a facility that provides "diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as inpatients or outpatients." *Id.*

Further, while DeJesus's interactions with VA therapy may technically be termed "outpatient treatment," viewing his overall treatment in combination with his residence at LZ-II indicates he was receiving voluntary, inpatient treatment. Under the MHPA, "'[i]npatient treatment' shall include all treatment that requires full or part-time residence in a facility." *Id.* While DeJesus could have continued to contact Outzs-Cleveland had he lived anywhere, in order to receive around-the-clock mental health assistance, continued group therapy, and the lessons in life skills, in addition to his contact with Outzs-Cleveland, DeJesus was required to maintain residence at LZ-II. The restrictions placed on DeJesus by LZ-II, his continued therapy with VA professionals, and the VA's intimate relationship with LZ-II, taken in the aggregate, satisfy us that DeJesus was receiving inpatient treatment at a qualifying facility under the MHPA. Because, as we have indicated above, the VA participated in a decision to discharge DeJesus from that inpatient facility, it had a duty to refrain from gross negligence in that decision and its treatment of DeJesus.

2.

Having determined that the VA had a duty under the MHPA, we must next consider whether its behavior was

30

sufficiently negligent to meet the "gross negligence" standard under the MHPA. In order to recover from an institution involved in mental health decisions, a plaintiff must prove more than simple negligence. The MHPA grants immunity to such institutions unless the plaintiff can show willful conduct or gross negligence. 50 Pa. Cons. Stat. § 7114(a).

> "It appears that the legislature intended to require that liability be premised on facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference. We hold that the legislature intended the term gross negligence to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care."

*Albright v. Abbington Mem. Hosp.*, 696 A.2d 1159, 1164 (Pa. 1997) (quoting *Bloom v. DuBois Reg'l Med. Ctr.*, 597 A.2d 671, 679 (Pa. Super. Ct. 1991)); *Walsh v. Borczon*, 881 A.2d 1, 7 (Pa. Super. Ct. 2005). While the behavior must be more than simple negligence, it need not reach the level of wanton conduct. "Negligence consists of inattention or inadvertence, whereas wantonness exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong." *Bloom*, 597 A.2d at 679. Gross negligence lies somewhere in between.

In its very thorough decision, the District Court ruled that the VA was grossly negligent in a number of ways. First, the District Court found that the failure of any member of the VA staff to be fully familiar with DeJesus's medical condition was a "gross deviation from the required standard of care in treating a patient." Further, the District Court ruled that the VA's decision to discharge DeJesus when he "was distressed and irrational, displaying poor control of his violent urges by brandishing a knife in his place of employment" and making comments "that his Primary Therapist believed were potentially suicidal" also constituted a gross breach of the standard of care. Finally, the District Court ruled that the VA was negligent in failing to commit or detain DeJesus for a psychiatric consultation once he had been discharged from LZ-II. Given DeJesus's behavior on March 22, the District Court stated that there was sufficient evidence to have DeJesus committed under Pennsylvania law or the VA's internal commitment procedures, which require a "clear and present danger to [the patient] or others." However, as the VA staff was unclear about its own commitment procedures and failed to conduct an appropriate suicide or psychiatric assessment, its conduct was grossly negligent. We review the District Court's determination that the VA acted in a grossly negligent manner for clear error. *See Rodriquez v. United States*, 823 F.2d 735, 742 (3d Cir. 1987).

The Pennsylvania cases finding only simple negligence involve significantly less egregious breaches of the standard of care than that exhibited here and often lack sufficient expert testimony to prove the plaintiff's case. For example, in *Albright*, after the plaintiff's wife missed an appointment, and with only four days remaining in a 90-day involuntary outpatient

32

treatment program, the plaintiff contacted the hospital because his wife was not taking her medication, seemed to be suffering from a manic episode, was chain smoking and had left a turkey to burn in the oven. The hospital responded by setting up an appointment with the plaintiff's wife after the holidays and encouraging the plaintiff to bring her to the hospital for involuntary commitment, a suggestion the plaintiff ignored. Soon thereafter, the plaintiff's wife was smoking carelessly and burned down their house, taking her own life with it. The Pennsylvania Supreme Court found this was insufficient to find gross negligence. *Albright*, 696 A.2d at 1165-66. While the hospital's failure to follow-up when the plaintiff's wife missed an appointment may have been an exercise of poor judgment, *id.* at 1167, the hospital did take some affirmative steps to repair the error by scheduling an appointment and encouraging the plaintiff to have his wife committed. *Id.* at 1166. "The purpose of the [MHPA's] immunity provision is to insulate mental health employees and their employers from liability for the very determination made by the Hospital here." *Id.* at 1167.

Unlike *Albright*, the District Court found that the VA had more serious warning signs regarding DeJesus's condition than simply leaving a turkey burning in the oven. Further, no one on the VA's staff was familiar with DeJesus's medical history, no one scheduled any kind of an appointment after he called distraught over his pending divorce, and there was insufficient communication between members of the VA staff.

Further, Camille and Faulk presented detailed expert testimony by Dr. Goldstein indicating that the VA's behavior grossly deviated from the appropriate standard of care. Dr. Goldstein testified that "the act of discharging [DeJesus] would

33

. . . take someone who's already in crisis and . . . compound the crisis many fold . . . . It's very inexplicable." He further testified as to five specific breaches and characterized them as "extreme and egregious":

> Well, I'd have to say they were very extreme and egregious, really, because multiple, multiple breaches, breakdowns in the system, multiple deviations, departures from the accepted standard of care. And in addition, it was the factor of the dimension of it being known that the – in other words, the person with the clinical responsibility, [Outzs-Cleveland], recognized the risk, explained why there was a risk, very well documented notes, and then proceeded to do nothing about it.

> [I]n other words, she recognized the danger, and didn't take appropriate steps, maybe because she didn't know how to take them. So I would say it was a major, major breakdown.

In its findings of fact, the District Court explicitly stated that it gave great credence to Dr. Goldstein's testimony, a credibility determination to which we give considerable deference. Dr. Goldstein's testimony, unlike the testimony in cases finding only simple negligence, unequivocally stated that the breach of duty in this case went beyond mere carelessness or inadvertence. It was what Dr. Goldstein called "a major, major breakdown." *See*, *e.g.*, *Walsh*, 881 A.2d at 8 (holding that there was insufficient evidence of gross negligence where expert only testified that clinic's failure to follow-up with patient was

34

"mismanagement" and "under-appreciation" of plaintiff's condition); *Downey v. Crozer-Chester Med. Ctr.*, 817 A.2d 517, 26 (Pa. Super. Ct. 2003) (holding that expert's testimony was insufficient to establish gross negligence where expert characterized hospital's failure to supervise patient while bathing only as a deviation from the standard of care).

This case closely accords with a decision of the Court of Common Pleas of Pennsylvania, Philadelphia County, which, while in no way binding, is instructive. In *Mertz v. Temple University Hospital*, 25 Pa. D. & C. 4th 541 (Pa. Comm. Pl. 1995), the court found sufficient evidence of gross negligence where a hospital failed to commit a patient after he exhibited signs of suicide. *Id.* at 557-58. The psychiatrist on duty failed to do anything more than review the patient's chart before releasing him. The court ruled that the hospital should have spent more time with the plaintiff and his medical records before releasing him, resulting in the hospital's liability for damages resulting from his subsequent suicide. *Id.* at 558; *see also Bloom*, 597 A.2d at 679 (sufficient evidence of gross negligence to withstand summary judgment where patient was admitted to the psychiatric unit, was not diagnosed or treated, and was later found hanging by her shoelaces in a bathroom in the unit).

In fact-intensive inquiries such as these, due deference is owed to the District Court's determination. Based on its extensive factual findings and application of the facts to the law of gross negligence, we are satisfied that the District Court's determination that the VA was grossly negligent is not only not clearly erroneous, but is a correct decision.

35

## VI.

In summary, because DeJesus did not make a threat of immediate harm against a readily identifiable victim, Camille's and Faulk's failure-to-warn claims were properly dismissed. However, the VA was under a statutory duty to refrain from gross negligence in its treatment of DeJesus, and the District Court did not err in its determination that the VA acted in such a grossly negligent manner when it strongly encouraged LZ-II to discharge DeJesus and then failed to commit him under its procedures or Pennsylvania's MHPA. These egregious breaches of the appropriate standard of care resulted in the tragic shooting deaths of four children and DeJesus's own suicide. Therefore, and for the reasons fully stated above, we will affirm the judgment of the District Court.